COURT OF APPEALS
SECOND 
DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-04-117-CV
 
 
 
IN 
THE INTEREST OF
 
 
 
E.R., 
A CHILD
 
 
------------
 
FROM 
THE 323RD DISTRICT COURT OF TARRANT COUNTY
 
------------
 
MEMORANDUM OPINION[1]
 
------------
Introduction
        Appellant, 
April R., appeals the trial court’s order terminating her parental rights to 
her child, E.R.  In five points, appellant complains that (1) there was no 
evidence or insufficient evidence to support the jury’s finding that appellant 
engaged in conduct or knowingly placed E.R. with persons who engaged in conduct 
that endangered E.R., (2) there was no evidence or insufficient evidence to 
support the jury’s finding that appellant knowingly placed or knowingly 
allowed E.R. to remain in conditions or surroundings that endangered E.R., (3) 
there was insufficient evidence to support the jury’s finding that termination 
was in E.R.’s best interest, (4) the trial court erred in denying 
appellant’s motion for a separate trial, and (5) the trial court erred in 
admitting exhibits that were not timely produced in response to appellant’s 
discovery motion.  We affirm.
Facts
        E.R. 
was born premature in Birmingham, Alabama. At birth, she was twelve and a half 
inches long and weighed one pound five ounces.  She is the child of 
appellant and Robert R. E.R. was hospitalized for three months because of 
various complications resulting from her premature birth.  After E.R. was 
discharged from the hospital, appellant and Robert R. moved in with Robert 
R.’s mother, Joyce, in Alabama. Joyce and appellant disagreed over how to care 
for E.R. Joyce believed that appellant did not change or bathe E.R. as often as 
she should have.  Joyce testified that E.R. would be dirty and smelly with 
“dirt up underneath her fingernails” and “rings around her neck” and 
that appellant would let E.R. sit in her own urine and feces without changing 
her diaper.  Also, Joyce felt that appellant should hold and cuddle E.R. 
when feeding her instead of laying her on the couch with a bottle propped up by 
a blanket.
        Approximately 
two weeks after moving in with Joyce, Robert R. left with E.R. and appellant in 
his truck to go to Florida. From Florida they traveled to New York by bus.  
Robert R. testified that they were gone for three or four weeks and that during 
their time on the road, he and appellant were unable to provide E.R. with any 
follow-up medical care.
        Shortly 
after returning to Alabama, appellant, Robert R., and E.R. moved into a motel 
near Joyce’s house, and Robert R. returned to work as a longhaul truck driver.  
Joyce often visited appellant, taking appellant and E.R. to E.R.’s doctor 
appointments and sometimes taking E.R. back to her house for visits.  Joyce 
testified that when she arrived for one of these visits, appellant’s room 
smelled of marijuana smoke.  On another visit, Joyce discovered a strange 
man in the motel room with appellant playing video games while E.R. sat in her 
swing soaked in her own urine.  Joyce also testified that appellant did not 
appear to be feeding E.R. adequately.  Joyce noticed that the empty baby 
food jars on appellant’s counter hardly ever changed and that E.R. was always 
hungry when she visited Joyce.
        Appellant, 
Robert R., and E.R. moved to Texas in spring 2002.  They lived in the 
Budget Suites in Dallas. Robert R.’s father (Mike), stepmother, and two half 
siblings, Vanessa and David, also lived in the complex.  Appellant started 
working at the Santa Fe Cabaret in Dallas as a topless dancer.
        Both 
Vanessa and David testified to seeing appellant shake E.R. when she would not 
stop crying.  The children and their father, Mike, testified that they saw 
appellant push E.R.’s head down to make her go to bed.  David testified 
that he saw appellant slam E.R. to the floor in an attempt to quiet her.  
In addition to bruising on E.R., both children testified to seeing a 
“footprint” on her back.  Mike testified that he once saw E.R. 
unsupervised on the third floor of the motel near some stairs.  He 
testified that his son David had to grab E.R. and put her back in appellant’s 
room. Mike also testified to seeing bruising on E.R.
        Appellant 
took E.R. and left Robert R. in summer 2002.  Appellant testified that they 
were “[d]isagreeing with each other . . . sexually.”  After staying 
with friends for a while, appellant moved in with Tom Williams, a cab driver who 
drove her to and from the Santa Fe Cabaret.[2]  
In September 2002, Child Protective Services (CPS) received two referrals 
regarding E.R. Crystal Clay, the CPS investigator, visited the Euless apartment 
in which Tom Williams, appellant, and E.R. were living on September 17 and on 
October 3, 2002, but did not see anything out of the ordinary.
        Appellant 
testified that on the night of October 25 (early morning of October 26), 2002, 
Tom Williams picked her up at work with E.R. in his car.  Tom told her that 
E.R. had been injured when he fell on her as he was sitting in a chair trying to 
remove his boots.  When appellant got in the car, she noticed that E.R. was 
having difficulty breathing.  Instead of taking E.R. to a hospital in 
Dallas, appellant and Tom decided to take E.R. to Cook Children’s Hospital in 
Fort Worth because it was closer to their apartment in Euless.  The 
emergency room physician testified that appellant and Tom Williams smelled 
strongly of alcohol.
        The 
emergency room physician noticed that E.R. had multiple bruises, some of which 
were older than others.  Appellant testified that bruises on E.R.’s ear 
were the result of a bite from Tom Williams’s dog.  However, the 
radiologist testified that because there were no teeth marks and because the 
pattern of the bruise was not compatible with a bite, the bruising on E.R.’s 
ear likely resulted from a fall or a hit.
        The 
doctors performed a CAT scan on E.R. and discovered that she had a lacerated 
liver, which was bleeding into her abdominal cavity.  X rays revealed 
multiple broken ribs as well as twisting or shaking injuries to E.R.’s wrist 
and femur. E.R. had also sustained a “subarachnoid hemorrhage” injury to her 
brain.  The doctors concluded that E.R.’s injuries had occurred on 
several different occasions and had been intentionally inflicted.  The 
neurologist testified that appellant told him that E.R. was injured when Tom 
Williams fell on her when he was removing his boots.  He testified that 
this explanation did not coincide with E.R.’s injuries.  Tom Williams was 
later arrested and charged with injury to a child.[3]
        On 
October 28, 2002, the Texas Department of Protective and Regulatory Services (DFPS) 
filed a petition to terminate the parental rights of appellant and Robert R. to 
E.R. E.R. was removed from appellant’s custody and placed in foster care.  
After E.R.’s removal, appellant participated in the service plan developed by 
CPS.  Appellant attended parenting and anger management classes. She also 
attended counseling sessions.  She got engaged to and moved in with Carl 
Shiveley.  She quit working as a topless dancer and was working at 
McDonald’s at the time of the trial.  In addition, she tested negative on 
several random drug tests administered to her.
        On 
January 22, 2004, William and Mary Kathleen (Kathy) Beckham, appellees and 
E.R.’s foster parents, filed a petition to intervene and to terminate 
appellant’s and Robert R.’s parental rights. Appellees planned to adopt E.R.  
The termination case went to trial on February 23, 2004.  A jury found that 
(1) appellant knowingly placed or knowingly allowed E.R. to remain in conditions 
or surroundings which endangered the physical or emotional well-being of E.R., 
(2) appellant engaged in conduct or knowingly placed E.R. with persons who 
engaged in conduct which endangered the physical or emotional well-being of E.R., 
and (3) the termination of the parent-child relationship between appellant and 
E.R. would be in E.R.’s best interest.  The trial court entered an order 
terminating appellant’s and Robert R.’s parental rights.
Conduct
        In 
her first point, appellant argues that there was no evidence or insufficient 
evidence to support the jury’s finding that she engaged in conduct or 
knowingly placed E.R. with persons who engaged in conduct that endangered E.R.  
A parent’s rights to “the companionship, care, custody, and management” of 
his or her children are constitutional interests “far more precious than any 
property right.”  Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S. 
Ct. 1388, 1397 (1982).  “While parental rights are of constitutional 
magnitude, they are not absolute.  Just as it is imperative for courts to 
recognize the constitutional underpinnings of the parent-child relationship, it 
is also essential that emotional and physical interests of the child not be 
sacrificed merely to preserve that right.”  In re C.H., 89 S.W.3d 
17, 26 (Tex. 2002).  In a termination case, the State seeks not just to 
limit parental rights but to end them permanently—to divest the parent and 
child of all legal rights, privileges, duties, and powers normally existing 
between them, except for the child’s right to inherit.  TEX. FAM. CODE ANN. § 
161.206(b) (Vernon Supp. 2004-05); Holick v. Smith, 685 S.W.2d 18, 20 
(Tex. 1985).  We strictly scrutinize termination proceedings and strictly 
construe involuntary termination statutes in favor of the parent.  Holick, 
685 S.W.2d at 20-21; In re D.T., 34 S.W.3d 625, 630 (Tex. App.—Fort 
Worth 2000, pet. denied) (op. on reh’g).
        In 
proceedings to terminate the parent-child relationship brought under section 
161.001 of the family code, the petitioner must establish one or more of the 
acts or omissions enumerated under subdivision (1) of the statute and must also 
prove that termination is in the best interest of the child.  TEX. FAM. CODE ANN. § 
161.001 (Vernon 2002); Richardson v. Green, 677 S.W.2d 497, 499 (Tex. 
1984); Swate v. Swate, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. 
denied).  Both elements must be established; termination may not be based 
solely on the best interest of the child as determined by the trier of fact.  
Tex. Dep’t of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).
        Termination 
of parental rights is a drastic remedy and is of such weight and gravity that 
due process requires the petitioner to justify termination by clear and 
convincing evidence.  TEX. FAM. CODE ANN. §§ 161.001, 161.206(a); In re G.M., 
596 S.W.2d 846, 847 (Tex. 1980).  This intermediate standard falls between 
the preponderance standard of ordinary civil proceedings and the reasonable 
doubt standard of criminal proceedings.  G.M., 596 S.W.2d at 847; D.T., 
34 S.W.3d at 630.  It is defined as the “measure or degree of proof that 
will produce in the mind of the trier of fact a firm belief or conviction as to 
the truth of the allegations sought to be established.” Tex. Fam. Code Ann. § 101.007 (Vernon 
2002).
Legal Sufficiency
        The 
higher burden of proof in termination cases alters the appellate standard of 
legal sufficiency review.  In re J.F.C., 96 S.W.3d 256, 265 (Tex. 
2002). The traditional no-evidence standard does not adequately protect the 
parent’s constitutional interests.  Id.  In reviewing the 
evidence for legal sufficiency in parental termination cases, we must determine 
“whether the evidence is such that a factfinder could reasonably form a firm 
belief or conviction” that the grounds for termination were proven.  Id. 
at 265-66.  We must review all the evidence in the light most favorable to 
the finding and judgment.  Id. at 266.  This means that we must 
assume that the factfinder resolved any disputed facts in favor of its finding 
if a reasonable factfinder could have done so.  Id.  We must 
also disregard all evidence that a reasonable factfinder could have disbelieved.  
Id.  We must consider, however, undisputed evidence even if it does 
not support the finding.  Id.  If we determine that no 
reasonable factfinder could form a firm belief or conviction that the grounds 
for termination were proven, then the evidence is legally insufficient, and we 
must render judgment for the parent.  Id.
Factual Sufficiency
        The 
higher burden of proof in termination cases also alters the appellate standard 
of factual sufficiency review.  C.H., 89 S.W.3d at 25.  “[A] 
finding that must be based on clear and convincing evidence cannot be viewed on 
appeal the same as one that may be sustained on a mere preponderance.”  Id.  
In considering whether the evidence of termination rises to the level of being 
clear and convincing, we must determine “whether the evidence is such that a 
factfinder could reasonably form a firm belief or conviction” that the grounds 
for termination were proven.  Id.  Our inquiry here is whether, 
on the entire record, a factfinder could reasonably form a firm conviction or 
belief that the parent violated one of the conduct provisions of section 
161.001(1) and that the termination of the parent’s parental rights would be 
in the best interest of the child.  Id. at 28.
Analysis
        Here, 
there is evidence that appellant had physically abused E.R.  See In re 
S.H.A., 728 S.W.2d 73, 83 (Tex. App.—Dallas 1987, writ ref’d n.r.e.).  
Vanessa and David testified to seeing appellant physically abuse E.R., and both 
the children and their father testified to seeing bruises on E.R. while 
appellant and Robert R. were living at the Budget Suites in Dallas.
        Also, 
there is evidence that appellant knew that Tom Williams had been physically 
abusive toward E.R. before the October 26, 2002 incident.  Appellant 
admitted seeing bruises on E.R. before October 26. In a statement to the 
district attorney’s office, appellant said that during the second month of 
living with Tom Williams, she had noticed his becoming more aggressive toward 
E.R.  In the same statement, appellant said that when Tom Williams picked 
her up from work on October 26 and told her that E.R. was having trouble 
breathing, she asked him “What the f*** did you do to her this time?”
        Based 
on our review of the entire record, we conclude that a factfinder could 
reasonably form a belief or conviction that appellant engaged in conduct or 
knowingly placed E.R. with persons who engaged in conduct that endangered the 
physical or emotional well-being of E.R., and therefore, we hold that the 
evidence is legally and factually sufficient to support the jury’s finding.  
We overrule appellant’s first point.  Because a petitioner need establish 
only one of the acts or omissions enumerated under subdivision (1) of section 
161.001, we need not address appellant’s second point and can instead move 
directly to appellant’s third point.  See TEX. FAM. CODE ANN. § 
161.001.
Best Interest
        In 
her third point, appellant argues that there was insufficient evidence to 
support the jury’s finding that termination was in E.R.’s best interest.  
Appellant argues that there was no evidence that she failed to adequately feed, 
house, or secure basic medical care for E.R.  She points to the fact that 
she worked hard on her service plan, attended parenting and anger control 
classes, and participated in counseling.  She also notes that she passed 
all her random drug tests.
        Nonexclusive 
factors that the trier of fact in a termination case may use in determining the 
best interest of the child include
 
        (1)the 
desires of the child,
 
        (2)    the 
emotional and physical needs of the child now and in the future,
 
        (3)    the 
emotional and physical danger to the child now and in the future,
 
        (4)    the 
parental abilities of the individuals seeking custody,
 
        (5)    the 
programs available to assist these individuals to promote the best interest of 
the child,
 
        (6)    the 
plans for the child by these individuals or by the agency seeking custody,
 
        (7)    the 
stability of the home or proposed placement,
 
        (8)    the 
acts or omissions of the parent which may indicate that the existing 
parent-child relationship is not a proper one, and
 
        (9)any 
excuse for the acts or omissions of the parent.
    

Holley 
v. Adams, 544 S.W.2d 367, 371-72 (Tex. 1976).  These factors are not 
exhaustive.  Some listed factors may be inapplicable to some cases; other 
factors not on the list may also be considered when appropriate.  C.H., 
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may 
be sufficient in a particular case to support a finding that termination is in 
the best interest of the children.  Id.  On the other hand, the 
presence of scant evidence relevant to each Holley factor will not 
support such a finding.  Id.
The Emotional and Physical Needs of E.R. Now and in 
the Future
        E.R. 
has various medical conditions including asthma, acid reflux, hydrocephalus, and 
brain damage.  Also, Dr. Warren Marks, E.R.’s pediatric neurologist, 
testified that E.R. has developmental problems that will likely continue in the 
future.  He testified that because of these problems, E.R. would need a 
nurturing parent who was committed to providing E.R. with resources, including 
special services. E.R. has shown behavior evidencing emotional problems.  
Appellee Kathy Beckham testified that E.R. would “come unglued” when 
appellees would wrestle with their children.  Kathy Beckham also testified 
that when her other children spilled something, E.R. would get down with her 
hands underneath her, put her head down and wail because she was afraid someone 
was coming after her.
The Emotional and Physical Danger to E.R. Now and in 
the Future
        There 
is evidence that appellant physically abused E.R. Moreover, appellant has shown 
an inability to protect E.R. from physical danger.  Appellant testified 
that Tom Williams did not have unsupervised contact with E.R. before the middle 
of October 2002, and yet the radiologist testified that some of E.R.’s rib 
fractures were six weeks to three or four months old.  Genie Long, a CPS 
caseworker, testified that despite the fact that appellant has worked hard on 
her service plan, she recommends that appellant’s parental rights be 
terminated.  She testified that because she does not know who was 
responsible for all of E.R.’s injuries, the risk of returning E.R. to 
appellant has not been reduced.
        During 
and after the October 26 incident, appellant displayed a general lack of concern 
regarding the seriousness of E.R.’s injuries and who was responsible for 
them.  Instead of taking E.R. to the nearest hospital when she was 
seriously injured on October 26, appellant took E.R. to a hospital in Fort Worth 
because it was more conveniently located in relation to her home.  During 
trial, appellant seemed to accept that Tom Williams injured E.R., yet on appeal, 
she says the identity of the person who injured E.R. is unknown.
        Crystal 
Clay testified that on October 26, appellant told her that she had previously 
seen bruises on E.R. and that she had asked for an explanation from Tom Williams 
but that he could not give her one.  This concerned Clay because E.R. was 
not ambulatory.  Genie Long testified that at the temporary order hearings 
in October and December 2002, appellant giggled when shown pictures of E.R.’s 
injuries taken at the hospital.  She testified that appellant then denied 
ever seeing the injuries on E.R.
        Appellee 
Kathy Beckham testified that she once asked appellant whether she felt bad about 
what happened to E.R., to which appellant responded, “[N]o, not really, 
because I didn’t know and I wasn’t there and [E.R.] didn’t change, I had 
no way of knowing, and I don’t feel bad about something I don’t know 
about.”  Detective Skiles, who was investigating the October 26 incident, 
testified that after speaking with appellant, he had the impression that 
appellant knew that E.R. had been injured previously and that considering the 
numerous bruises on E.R., he did not see how appellant could not have known.
        Appellant 
was not cooperative with the investigation into E.R.’s injuries.  
Detective Skiles testified that he had made numerous attempts to contact 
appellant, leaving his business card and asking appellant to call him, but that 
appellant never called him back.  When asked at trial why she did not tell 
CPS the names of all of E.R.’s caregivers, appellant responded that “it was 
none of their business.”
        Appellant 
has lived with a number of different men.  Before marrying Robert R., she 
lived with Mark Anderson, Chuck Windsor, and somebody named Dooger.  After 
she left Robert R., she lived with friends before moving in with Tom 
Williams.  She lived with Mickey and Daniel Pokorski after CPS took custody 
of E.R.  At the time of the trial, she was living with Carl Shiveley and 
was planning to marry him.
        Mary 
Dale Headrick, the CPS visitation supervisor, testified that during 
appellant’s visits with E.R., E.R. did not appear to be afraid of appellant 
and that appellant and E.R. seemed to love each other.  She testified that 
appellant and E.R. appeared to be bonded to one another.  She also 
testified that E.R. interacted well with appellant’s boyfriend Carl Shiveley.
        However, 
Kathy Beckham testified that at E.R.’s specialist appointments, E.R. would 
refuse to interact with appellant.  Moreover, E.R. made two visits to an 
audiologist during which she was left in a soundproof booth with 
appellant.  Both times, E.R. became upset and started screaming when she 
realized that she was alone with appellant, and she did not calm down until 
someone else came into the room.  Kathy Beckham testified that it was 
extremely uncommon for appellant and E.R. to play together and that E.R. did not 
want to participate.  She also testified that E.R. would throw tantrums 
before going on visits to see appellant.
Parental Abilities of Individuals Seeking Custody
        As 
E.R.’s foster parents, appellees have attended to E.R.’s medical and 
developmental needs.  During the sixteen months in which they cared for 
her, appellees took E.R. to numerous specialist appointments, including visits 
to an audiologist, speech pathologist, nutritionalist, and a neurologist.  
Appellees have gotten E.R. involved in Early Childhood Intervention (ECI).  
The ECI worker testified that E.R. has made progress while staying with 
appellees and that appellees are meeting E.R.’s needs.  Appellees plan to 
adopt E.R. Appellees have adopted two other children who were placed in their 
foster care after being removed from the biological mother’s custody.
        Genie 
Long testified that E.R. appears to have bonded with appellees.  She 
testified that E.R. runs to appellees for comfort and that she talks, laughs, 
and plays with them.  Long also testified that E.R. interacts with her 
foster siblings.  She testified that E.R. would play and sometimes fuss 
with the children just like siblings would.
 
Acts or Omissions Indicating the Existing Parent/Child 
Relationship is not Proper.
 
        There 
is evidence that appellant failed to attend to E.R.’s basic needs by not 
bathing her and changing her diaper.  Further, contrary to appellant’s 
arguments, there is evidence that appellant failed to adequately feed E.R. and 
provide her with basic medical care.  Sharon Johnson, a dietician who 
worked for ECI, testified that E.R. was not receiving adequate nutrition while 
she was living with appellant, as evidenced by E.R.’s unusually rapid growth 
rate and eating behavior after she went to live with appellees.  Robert 
R.’s mother, Joyce, testified that she was concerned that appellant was not 
feeding E.R. adequately.  The emergency room physician described E.R. as a 
“scrawny child.”  Appellee Kathy Beckham testified that when being fed, 
E.R. would lean forward for more food while vomiting.
        Despite 
E.R.’s special medical problems, appellant and Robert R. took her out on the 
road for almost a month, only two weeks after E.R. had been released from the 
hospital.  Crystal Clay testified that after reviewing the records from 
E.R.’s pediatrician in Alabama, she was concerned that appellant and Robert R. 
had not kept E.R. on an apnea monitor and that E.R. had missed several RSV 
vaccinations that she needed.  Caseworker Angela Gillock testified that 
appellant continued to smoke throughout the pendency of the case despite 
Angela’s expressing to appellant her concerns about the effects of cigarette 
smoke on E.R.’s asthma.
        Kathy 
Beckham testified that after the October 26 incident, when E.R. was in her care, 
she attempted to obtain E.R.’s medical history from appellant.  She 
testified that appellant was oblivious of E.R.’s previous medical needs and 
“not really interested.”
        Based 
on our review of the entire record, we hold that the evidence was factually 
sufficient to support the trial court’s finding that termination was in 
E.R.’s best interest.  We overrule appellant’s third point.
Separate Trial
        In 
her fourth point, appellant argues that the trial court erred in denying her 
motion for a separate trial.[4]  Appellant 
complains that while Robert R. publicly proclaimed his intention to contest 
termination of his parental rights, he actually had no intention of contesting 
the case and wanted appellees to have custody of E.R.  Further, appellant 
argues that Robert R. intended to sabotage her right to a fair and impartial 
jury trial.
        Specifically, 
appellant points to an email that Robert R. sent to her less than two weeks 
before the trial, on February 12, 2004, in which he said he planned to inform 
CPS that he felt E.R. should remain with her foster parents and that he would 
not be “fighting for [E.R.]” as long as he could retain his rights and be 
able to visit and write letters to E.R.  After receiving the email, 
appellant filed a motion for severance or in the alternative a motion for a 
separate trial, which the trial court denied.  Five days into the trial, on 
February 27, 2004, Robert R. filed a relinquishment of parental rights.  
The trial court denied appellant’s subsequent request for a mistrial.
        Rule 
174(b) of the Texas Rules of Civil Procedure provides that a “court in 
furtherance of convenience or to avoid prejudice may order a separate trial of 
any claim, cross-claim, counterclaim, or third-party claim, or of any separate 
issue or of any number of claims, cross-claims, counterclaims, third-party 
claims, or issues.” Tex. R. Civ. P. 174(b).  We review 
a trial court’s denial of a motion for a separate trial for abuse of 
discretion.  See Womack v. Berry, 291 S.W.2d 677, 683 (Tex. 1956).
        To 
determine whether a trial court abused its discretion, we must decide whether 
the trial court acted without reference to any guiding rules or principles; in 
other words, whether the act was arbitrary or unreasonable.  See 
Carpenter v. Cimarron Hydrocarbons Corp., 98 S.W.3d 682, 687 (Tex. 2002); Downer 
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985), cert. 
denied, 476 U.S. 1159 (1986).  Merely because a trial court may decide 
a matter within its discretion in a different manner than an appellate court 
would in a similar circumstance does not demonstrate that an abuse of discretion 
has occurred.  Downer, 701 S.W.2d at 241-42.
        An 
abuse of discretion does not occur when the trial court bases its decisions on 
conflicting evidence.  Davis v. Huey, 571 S.W.2d 859, 862 (Tex. 
1978); see also Goode v. Shoukfeh, 943 S.W.2d 441, 446 (Tex. 1997).  
Furthermore, an abuse of discretion does not occur as long as some evidence of 
substantive and probative character exists to support the trial court’s 
decision.  Butnaru v. Ford Motor Co., 84 S.W.3d 198, 211 (Tex. 
2002); Holley v. Holley, 864 S.W.2d 703, 706 (Tex. App.—Houston [1st 
Dist.] 1993, writ denied).
        While 
a trial court has broad discretion in deciding whether to grant a motion for 
separate trial, this discretion is not unlimited.  U.S. Fire Ins. Co. v. 
Millard, 847 S.W.2d 668, 671 (Tex. App.—Houston [1st Dist.] 1993, no 
writ).
  
When all of the facts and circumstances of the case unquestionably require a 
separate trial to prevent manifest injustice, and there is no fact or 
circumstance supporting or tending to support a contrary conclusion, and the 
legal rights of the parties will not be prejudiced thereby, there is no room for 
the exercise of discretion.
  
Womack, 
291 S.W.2d at 683.
        Here, 
we are unable to conclude that the facts and circumstances of the case 
unquestionably required a separate trial to prevent manifest injustice.  
Appellant does not say exactly how Robert R. intended to sabotage her 
case.  She does not argue that she was unable to equalize jury strikes or 
that certain evidence was admitted that would not have been admitted had a 
separate trial been granted.  Moreover, Robert R.’s e-mail does not show 
that his interests were so different from appellant’s that a separate trial 
was required.  The e-mail shows that while Robert R. did not intend to seek 
custody of E.R., he did not want his parental rights terminated.  
Therefore, we hold that the trial court did not abuse its discretion in denying 
appellant’s motion for a separate trial.  We overrule appellant’s 
fourth point.
Discovery
        In 
her fifth point, appellant argues that the trial court erred in admitting 
exhibits that were not timely produced in response to appellant’s discovery 
motion.  Appellant cites rule 193.6 of the Texas Rules of Civil Procedure, 
which provides as follows:
  
A party who fails to make, amend, or supplement a discovery response in a timely 
manner may not introduce in evidence the material or information that was not 
timely disclosed . . . unless the court finds that:
(1) 
there was good cause for the failure to timely make, amend, or supplement the 
discovery response; or
(2) 
the failure to timely make, amend, or supplement the discovery response will not 
unfairly surprise or unfairly prejudice the other parties.
 
Tex. R. Civ. P. 193.6(a).
        On 
December 19, 2003, appellant sent DFPS a request for production, which included, 
among other things, (1) all drawings, graphics, charts, photographs, tape or 
electronic recordings and audio/video recordings that constitute matters 
relevant to the subject matter of this lawsuit, and (2) all records, including 
invoices relating to medical, psychological, and psychiatric treatments, 
consultations, or diagnoses of the parties and child, including but not limited 
to any prescriptions.  Appellant argues that DFPS had several items in its 
possession that were covered by the request for production but were not timely 
produced.  Specifically, appellant complains about the admission of 
pictures taken of E.R. at the hospital, as well as the X rays and CAT scans of 
E.R.’s injuries.  Appellant did not object when the pictures taken of E.R. 
in the hospital were offered at trial.  Therefore, any complaint regarding 
the pictures is waived.  See Tex. R. App. P. 33.1(a); Tex. R. Evid. 103(a)(1).  But 
appellant did object when the X rays and CAT scans of E.R.’s injuries were 
offered.
        We 
need not address whether the trial court erred in admitting these exhibits 
because we hold that any error would be harmless.  As noted by appellees, 
appellant did not request discovery from them.  Therefore, there is nothing 
to suggest that appellees would not have been able to admit the exhibits had 
DFPS been prohibited under Rule 193.6 from doing so.  See Tex. R. Civ. P. 193.6(a); Brook v. 
Brook, 865 S.W.2d 166, 172 (Tex. App.—Corpus Christi 1993), aff’d, 
881 S.W.2d 297 (Tex. 1994).  Furthermore, appellees made an offer of proof 
at trial that they would have called the radiologist to testify and would have 
offered the same exhibits had the state not done so.  Appellees stated that 
discovery had not been propounded to them.  Finally, the exhibits were 
merely cumulative of the properly admitted testimony from the radiologist 
regarding E.R.’s injuries.  See Gee v. Liberty Mut. Fire Ins. Co., 
765 S.W.2d 394, 396 (Tex. 1989) (holiding that error in admitting evidence is 
harmless if merely cumulative of properly admitted evidence); In re W.J.H., 
111 S.W.3d 707, 714 (Tex. App.—Fort Worth 2003, pet. denied) (same).  We 
overrule appellant’s fifth point.
Conclusion
        Having 
overruled all of appellant’s points, we affirm the trial court’s judgment.
   
   
                                                                  PER 
CURIAM
 
 
 
PANEL 
F:   LIVINGSTON, WALKER, and MCCOY, JJ.
 
DELIVERED: 
February 10, 2005

 
NOTES
1.  
See Tex. R. App. P. 47.4.
2.  
It is unclear exactly when appellant began living with Tom Williams.
3.  
Although appellant was not arrested, Detective Charles T. Skiles testified at 
trial that, in light of recently received information from the district 
attorney’s office, he had reopened the investigation regarding appellant and 
was considering preparing an arrest warrant for her.
4.  
At trial, appellant made a motion for severance or in the alternative a separate 
trial.  However, on appeal, appellant argues only the separate trial issue.